UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASA EXPRESS CORP,

                        Plaintiff,

        v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

                        Defendant.

PHARO GAIA FUND LTD., *et al.*,

                        Plaintiffs,

        v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

                        Defendant.

Case Nos.  18-cv-11940 (AT)
           19-cv-3123 (AT)

## MEMORANDUM OF THE BOLIVARIAN REPUBLIC OF VENEZUELA IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR A STAY

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689

*Attorneys for the Bolivarian Republic of
Venezuela*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 2

    A.    The Humanitarian Emergency ............................................................... 2

    B.    The Current Lawsuits .......................................................................... 6

ALLEGATIONS AND PROCEDURAL BACKGROUND ...................................... 7

ARGUMENT .................................................................................................. 8

I.    The Court Should Stay These Cases ............................................................ 8

    A.    This Court Should Exercise Its Inherent Power to Stay These Cases .................... 8

    B.    The Court Should Stay These Cases in the Interest of International Comity ........ 14

            1.    *Canada Southern Railway* Comity-Based Abstention is Appropriate. ........................................................................... 15

            2.    A Stay Is Justified Under the Customary International Law Doctrine of Necessity. ......................................................... 19

            3.    A Stay Is Justified Because the Republic Is Unable to Access Resources Necessary to Perform or Settle Its Financial Obligations at this time. ....................................................... 22

II.    Alternatively, if the Court Moves Forward, It Should Deny Plaintiffs' Request for Prejudgment "Interest on Interest" and Establish Fraud-Prevention and Error-Prevention Mechanisms Concerning the Securities Underlying the Claims. ..................................................................................................... 23

    A.    The Court should Deny Plaintiffs' Request for Pre-Judgment "Interest on Interest." ......................................................................... 23

            1.    The Federal Standard for Determining Prejudgment Interest Applies. ................................................................................. 23

            2.    The Court Should Not Award Prejudgment Interest on Interest Payments. .............................................................................. 26

    B.    The Court Should Establish Fraud-Prevention and Error-Prevention Mechanisms Concerning the Securities Underlying the Claims Before Awarding Judgment ........................................................................... 27

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allied Bank Int'l v. Banco Credito Agricola*,
    757 F.2d 516 (2d Cir. 1985) ........................................................................ 16, 17

*Allied Bank Int'l v. Banco Credito Agricola*,
    733 F.3d 23, 1984 U.S. App. LEXIS 23237 (2d Cir. 1984) ........................... 16, 17

*Arch Trading Corp. v. Republic of Ecuador*,
    839 F.3d 193 (2d Cir. 2016) .................................................................. 23, 25, 26

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) .................................................................................... 23

*Canada Southern Railway Co. v. Gebhard*,
    109 U.S. 527 (1883) ..................................................................... 14, 15, 16, 18

*Capital Ventures Int'l v. Republic of Argentina*,
    552 F.3d 289 (2d Cir. 2009) ........................................................................ 25

*Clinton v. Jones*,
    520 U.S. 681 (1997) ..................................................................................... 8

*In re Colonial Realty Co.*,
    980 F.2d 125 (2d Cir. 1992) ........................................................................ 10

*Commercial Union Assurance Co. v. Milken*,
    17 F.3d 608 (2d Cir. 1994) ...................................................................... 23, 27

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
    Nos. 15-CV-1082-LPS *et al.*, 2019 WL 6785504 (D. Del. Dec. 12, 2019) ........... 3, 11, 13, 14

*Crystallex Int'l Corp. v. Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ............................................................ 3, 12, 13, 14

*Delaware v. New York*,
    507 U.S. 490 (1993) .................................................................................... 28

*Deutsche Bank Tr. Co. Americas v. Am. Gen. Life Ins. Co.*,
    No. 1:15-CV-3869-GHW, 2015 WL 5178408 (S.D.N.Y. Sept. 4, 2015) ............... 27

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*,
    67 F.3d 1063 (2d Cir. 1995) ...................................................................... 23, 26

ii

*FCS Advisors, Inc. v. Fair Fin. Co.*,
  605 F.3d 144 (2d Cir. 2010) ...................................................................24

*Filartiga v. Pena-Irala*,
  630 F.2d 876 (2d Cir. 1980) ...................................................................19

*Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*,
  295 F.3d 1065 (10th Cir. 2002)...............................................................24

*Jiménez v. Palacios*,
  19-CV-0490, 2019 Del. Ch. LEXIS 288 (Del. Ch. Aug. 2, 2019)...........................3

*Jiminez v. Credit One Bank, N.A.*,
  377 F. Supp. 3d 324 (S.D.N.Y. 2019) ........................................................8

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) .....................................................................19

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ...............................................................................8

*Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*,
  896 F.3d 174 (2d Cir. 2018) ............................................................. 14, 19

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
  676 F.3d 83 (2d Cir. 2012) ......................................................................8

*McKeel v. Islamic Republic of Iran*,
  722 F.2d 582 (9th Cir. 1983) ..................................................................25

*NML Capital v. Republic of Argentina*,
  17 N.Y.3d 250 (2011)............................................................................25

*NML Capital v. Republic of Argentina*,
  435 F. App'x 41 (2d Cir. 2011) ...............................................................25

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
  No. CV 16-1533 (ABJ), 2019 WL 2185040 (D.D.C. May 21, 2019)...................3

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
  109 F.3d 850 (2d Cir. 1997) ...................................................................15

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
  165 B.R. 379 (S.D.N.Y. 1994)..................................................................15

*Range v. 480-486 Broadway, LLC*,
  810 F.3d 108 (2d Cir. 2015) .....................................................................9

iii

*Schipani v. McLeod,*
    541 F.3d 158 (2d Cir. 2008) ........................................................................................ 24, 26

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,*
    482 U.S. 522 (1987) ........................................................................................................ 14

*The Paquete Habana,*
    175 U.S. 677 (1900) ........................................................................................................ 19

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,*
    216 F. Supp. 2d 198 (S.D.N.Y. 2002) .......................................................................... 8, 14

*United States v. Trinidad,*
    839 F.3d 112 (1st Cir. 2016) ............................................................................................ 19

*Westinghouse Credit Corp. v. D'Urso,*
    371 F.3d 96 (2d Cir. 2004) .............................................................................................. 24

*Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*
    955 F.2d 831 (2d Cir. 1992) ........................................................................................ 26, 27

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
    296 F.3d 1154 (D.C. Cir. 2002) ...................................................................................... 14

**STATUTES**

28 U.S.C.
    § 1330 ................................................................................................................................ 23
    § 1330(a) ...................................................................................................................... 24, 26
    § 1332 ................................................................................................................................ 23
    § 1391(f) ............................................................................................................................ 23
    § 1441(d) ...................................................................................................................... 23, 24
    § 1602 ............................................................................................................................ 23, 25
    § 1605(a) ............................................................................................................................ 26
    § 1605(a)(1) ...................................................................................................................... 24
    § 1611 ................................................................................................................................ 23
    § 1961 .................................................................................................................................. 1
    § 1961(a) ............................................................................................................................ 27

50 U.S.C. § 1701(a)(1)(B) .......................................................................................................... 10

**REGULATIONS**

31 C.F.R.
    § 591.407 ...................................................................................................................... 10, 12
    § 591.506(c) .................................................................................................................. 10, 12

Exec. Order No. 13,884, 84 Fed. Reg. 38,843 (Aug. 5, 2019) .................................................... 9

# OTHER AUTHORITIES

Michelle Bachelet, Office of the United Nations High Commissioner for Human Rights, *Oral Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela* (Dec. 18, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/ DisplayNews.aspx?NewsID=25438&LangID=E ..................................................3

Dany Bahar & Meagan Dooley, *Venezuela Refugee Crisis to Become the Largest and Most Underfunded in Modern History*, Brookings Inst. (Dec. 9, 2019), https://www.brookings.edu/blog/up-front/2019/12/09/venezuela-refugee-crisis-to-become-the-largest-and-most-underfunded-in-modern-history/?utm_campaign= Brookings%Brief&utm_=hs_email&utm_medium=email&utm_content=80597832..............4

J. Robert Brown, *The Shareholder Communication Rules and the Securities and Exchange Commission: An Exercise in Regulatory Utility or Futility?*, J. Corp. L. 683 (1988)..................................................................................................28

*Cont. Cas. Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168 (Sept. 5, 2008)..................................................................................................20

James Crawford, *State Responsibility: The General Part* 305–15 (2013)...................20

*Gabcikovo-Nagymaros Project (Hung. v. Slovk.)*, Judgment, 1997 I.C.J. 7 (Sept. 25)...............20

*LG&E Energy Corp. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability (Oct. 3, 2006)..................................................................................21

*President Donald J. Trump Stands for Democracy in Venezuela* (May 1, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-stands-democracy-venezuela/ ..................................................................................18

Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), https://home.treasury. gov/news/press-releases/sm594 ..................................................................13, 18

Press Release, *US$1.35 Billion Needed to Help Venezuelan Refugees and Migrants and Host Countries*, UNHCR (Nov. 13, 2019), https://www.unhcr.org/news/press/2019/ 11/5dcbd7284/us135-billion-needed-help-venezuelan-refugees-migrants-host-countries.html..................................................................................................4

Press Release, *Venezuela: UNICEF seeks US$70 million to provide humanitarian assistance to 900,000 children*, UNICEF (Aug. 20, 2019), https://www.unicef.org/ press-releases/venezuela-unicef-seeks-us70-million-provide-humanitarian-assistance-900000-children..................................................................................5

*Remarks by Vice President Pence in Press Gaggle, Jacksonville, Florida* (May 20, 2019), https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-press-gaggle-jacksonville-florida/..................................................18

Responsibility of States for Internationally Wrongful Acts, art. 25, U.N. G.A. Res. 56/83 (Dec. 12, 2001) ................................................................. 19, 20

*Restatement (Third) of Foreign Relations Law* § 111 (1987) ..................................................... 19

*State Responsibility*, Y.B. Int'l L. Comm'n (1980), U.N. Doc. A/CN.4/Ser.A/1980/Add.1 ........................................................... 20, 22

*State Responsibility*, Y.B. Int'l L. Comm'n (2001), U.N. Doc. A/CN.4.Ser.A/2001/Add.1 .............................................................. 20

U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *U.S. Government Support for the Democratic Aspirations of the Venezuelan People*, https://www.state.gov/u-s-government-support-for-the-democratic-aspirations-of-the-venezuelan-people/#crisis ......................................................................................... 2

U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *The United States Congratulates Interim President Juan Guaido on His Re-Election as President of the National Assembly* (Jan. 5, 2020), https://www.state.gov/the-united-states-congratulates-interim-president-juan-guaido-on-his-re-election-as-president-of-the-national-assembly/ ..................................................................................... 2, 18

*Venezuela Regional Crisis*, *Fact Sheet #1*, U.S. Agency for Int'l Dev. (Mar. 1, 2019), https://www.usaid.gov/sites/default/files/documents/1866/____032019-01-. ................... 4, 5

*Venezuela Regional Crisis*, *Fact Sheet #2*, U.S. Agency for Int'l Dev. (Apr. 10, 2019), https://www.usaid.gov/sites/default/files/documents/1866/04.10.19_-_USG___Crisis__Sheet_2.pdf ....................................................... 4, 5

*Venezuela's Humanitarian Emergency*, Human Rights Watch (Apr. 2019), https://www.hrw.org/sites/default/files/report_pdf/venezuela0419_web.pdf .................... 4, 5

Colleen Walsh, *Understanding Venezuela's Collapse*, Harvard Gazette (Feb. 12, 2019), https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/ ............................................................... 3, 4, 5

## INTRODUCTION

This Court should stay these cases, as other District Courts around the nation have done in cases against the Republic, in light of the extraordinary humanitarian, political, and economic crisis facing the Republic and the serious foreign-policy concerns they implicate. As the Court is aware, the Republic is in the midst of one of the worst man-made disasters in modern history. For two decades, the Republic's economy has been systematically destroyed; the result has been widespread poverty, hunger, and disease, and an unprecedented refugee crisis. The foreign policy of the United States strongly counsels in favor of a stay in order to help alleviate the humanitarian crises, to support U.S. policy of restoring democracy in Venezuela, and to provide time for the Republic to propose a restructuring plan consistent with international norms. Most recently, Chief Judge Stark of the District of Delaware decided to stay multiple cases pending against the Republic and its instrumentalities, animated by these interests. In these exceptional circumstances, this Court, too, should exercise its discretion to stay proceedings.

If, however, the Court determines to move forward, the Republic objects to plaintiffs' calculation of prejudgment "interest on interest" using New York's statutory rate of 9%. Under federal law, this Court has broad discretion to grant or deny prejudgment interest. The securities are *already* accruing interest at premium rates, and will continue to do so until they are repaid or judgment is entered. It would be contrary to the parties' reasonable expectations, in light of these circumstances, to grant plaintiffs additional interest on top of the premium rates they already enjoy—especially since any additional payments will come at the expense of the Venezuelan people. At most, any interest must be limited to the standard federal rate, set forth in 28 U.S.C. § 1961.

Finally, if the Court decides to move forward at this time, the Court should also order briefing to establish a mechanism to ensure that any subsequent transfer of securities that form the basis for a judgment does not give rise to double-dip claims. The court has a variety of options,

but some mechanism is necessary to avoid fraud or mistake, such as the potential double-counting of claims (which will be evidenced by both a judgment and the securities themselves), and to facilitate the ultimate reconciliation of claims that will need to take place at the time the Republic undertakes a comprehensive restructuring of its financial obligations.

## BACKGROUND

### A.     The Humanitarian Emergency

Venezuela is a nation rich in natural resources and human enterprise. It has the largest proven petroleum reserves of any nation on Earth. But for nearly two decades, its economy has been systematically destroyed through nationalizations, expropriations, over-indebtedness, and kleptocracy under the rule of Hugo Chávez and recently, Chávez´s protégé, Nicolás Maduro.

On January 10, 2019, the freely and fairly elected Venezuelan National Assembly determined, in accordance with the Venezuelan constitution, that the presidency was vacant because Mr. Maduro had claimed victory in a fraudulent election held in 2018. On January 23, 2019, National Assembly President Juan Guaidó, supported by the democratically elected National Assembly, assumed the interim Presidency of Venezuela in an effort to restore democracy and constitutional rule. The United States immediately recognized Mr. Guaidó as the legitimate interim President of Venezuela and rejected the legitimacy of the Maduro regime.[1] On January 7, 2020, Juan Guaidó was again sworn in as President of the National Assembly and therefore, as Interim President, as was recognized by the Unites States.[2]

---

[1]     *See* U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *U.S. Government Support for the Democratic Aspirations of the Venezuelan People*, https://www.state.gov/u-s-government-support-for-the-democratic-aspirations-of-the-venezuelan-people/#crisis.

[2]     *See* U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *The United States Congratulates Interim President Juan Guaido on His Re-Election as President of the National Assembly* (Jan. 5, 2020), https://www.state.gov/the-united-states-congratulates-interim-president-juan-guaido-on-his-re-election-as-president-of-the-national-assembly/ ("*United States Congratulates Guaidó*").

Mr. Maduro has refused to relinquish his position and has refused to surrender control of state organs, such as the Ministry of Foreign Affairs and the Ministry of Justice. Under U.S. law, however, the Maduro government is not recognized by the courts: Only the Guaidó administration and the National Assembly are so recognized, and only the Interim Government may appear in U.S. courts to represent the interests of the Venezuelan people. *See Crystallex Int'l Corp. v. Republic of Venezuela*, 932 F.3d 126, 135 n.2 (3d Cir. 2019); *Crystallex Int'l Corp. v. PDV Holding Inc.*, Nos. 15-CV-1082-LPS *et al.*, 2019 WL 6785504, at *3 n.9 (D. Del. Dec. 12, 2019); *Jiménez v. Palacios*, 19-CV-0490, 2019 Del. Ch. LEXIS 288, at *21–22 (Del. Ch. Aug. 2, 2019); *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. CV 16-1533 (ABJ), 2019 WL 2185040, at *4–5 (D.D.C. May 21, 2019); Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044 (D.C. Cir. May 1, 2019) (per curiam), Doc. No. 1785518.

In addition to contending with a constitutional crisis, the Guaidó administration and the National Assembly face an unprecedented economic and humanitarian crisis in Venezuela. The policies of former presidents Maduro and Chávez, combined with rampant corruption, destroyed Venezuela's infrastructure and domestic production capacity, leading to "the biggest economic collapse in human history outside of war or state collapse."[3] Venezuela's economy has lost a cumulative GDP of 62.2% since 2013.[4] As Dr. Ricardo Hausman of Harvard has noted, "[t]hat is double the size of the U.S. Great Depression. It's double the size of the Greek crisis. It's double

---

[3]   Colleen Walsh, *Understanding Venezuela's Collapse*, Harvard Gazette (Feb. 12, 2019), https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezue-las-collapse/.

[4]   Michelle Bachelet, Office of the United Nations High Commissioner for Human Rights, Oral *Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela* (Dec. 18, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25438&LangID=E.

the size of the economic collapse that occurred during the Spanish Civil War. It is something of really unique proportions."[5]

The United Nations High Commissioner for Refugees (UNHCR) estimates that approximately 4.6 million people—about 16% of the population—have fled Venezuela as of November 2019.[6] As the Brookings Institution has noted, this number "is strikingly similar to the 4.8 million people that had fled Syria by 2015, four years into the massive forced displacement crisis there."[7] And if current trends continue, the number of displaced people could grow to 6.5 million by the end of 2020—"far outpacing the speed of displacement seen in Syria."[8]

For those remaining, life is grim. Many lack access to clean water.[9] Eight out of ten households lack a reliable source of food.[10] Eighty percent of the population can no longer afford basic healthcare.[11] Nearly 70% of Venezuela's hospitals report intermittent power outages and a lack of

---

[5]   Walsh, *supra* note 3.

[6]   Press Release, *US$1.35 Billion Needed to Help Venezuelan Refugees and Migrants and Host Countries*, UNHCR (Nov. 13, 2019), https://www.unhcr.org/news/press/2019/11/5dcbd7284/us135-billion-needed-help-venezuelan-refugees-migrants-host-countries.html ("UNCHR Report"); Dany Bahar & Meagan Dooley, *Venezuela Refugee Crisis to Become the Largest and Most Underfunded in Modern History*, Brookings Inst. (Dec. 9, 2019), https://www.brookings.edu/blog/up-front/2019/12/09/venezuela-refugee-crisis-to-become-the-largest-and-most-underfunded-in-modern-history/?utm_campaign=Brookings%20Brief&utm_source=hs_email&utm_medium=email&utm_content=80597832 ("Brookings Study").

[7]   Brookings Study, *supra* note 6.

[8]   UNCHR Report, *supra* note 6; Brookings Study, *supra* note 6.

[9]   *Venezuela Regional Crisis*, *Fact Sheet #2* at 5, U.S. Agency for Int'l Dev. (Apr. 10, 2019), https://www.usaid.gov/sites/default/files/documents/1866/04.10.19_-_USG_Venezuela_Regional_Crisis_Fact_Sheet_2.pdf ("USAID Fact Sheet #2").

[10]   *Venezuela's Humanitarian Emergency* at 26, Human Rights Watch (Apr. 2019), https://www.hrw.org/sites/default/files/report_pdf/venezuela0419_web.pdf ("HRW Report").

[11]   *Venezuela Regional Crisis*, *Fact Sheet #1* at 6, U.S. Agency for Int'l Dev. (Mar. 1, 2019), https://www.usaid.gov/sites/default/files/documents/1866/venezuela_regional_crisis_fs01_03-01-2019.pdf.

potable water.[12] Venezuela now experiences routine outbreaks of vaccine-preventable diseases that had previously been eradicated.[13] More than one million children no longer attend school.[14] And the crisis has been further exacerbated by rolling blackouts.[15] Dr. Hausman describes the crisis in stark terms:

> The consequence of [Venezuela's economic] collapse is expressed in the fact that the minimum wage today is $6 a month. That means that the minimum wage does not buy two eggs a day. It buys something like 700 calories a day. It means that because you don't have the calories and the proteins and the medicines for 30 million people, people are losing weight. This has been measured at something like eight kilos a year on average—there is in that the stunting of children's growth. . . . [T]here are shortages of electricity, of water, of transportation. There are no buses, there are no trucks, and there are no tractors because of a shortage of spare parts. There's no cooking gas, there's no gasoline. That's the current situation. It's a humanitarian crisis of Syrian proportions.[16]

The humanitarian emergency is closely intertwined with Venezuela's current lack of foreign currency. Almost all of Venezuela's debt was incurred at a time when robust production from Venezuela's vast oil and gas reserves provided the nation with hard currency to import food, medicine, and other products and to repay debt incurred in the ordinary course. But during the Chávez and Maduro regimes, expropriations, corruption, and kleptocracy destroyed infrastructure and domestic production capacity. Today, the Venezuelan people cannot meet their own needs through local production. Imports represent the only immediate source of food, medical equipment, and

---

[12]  *Id.*

[13]  HRW Report, *supra* note 10, at 20.

[14]  Press Release, *Venezuela: UNICEF seeks US$70 million to provide humanitarian assistance to 900,000 children*, UNICEF (Aug. 20, 2019), https://www.unicef.org/press-releases/venezuela-unicef-seeks-us70-million-provide-humanitarian-assistance-900000-children.

[15]  USAID Fact Sheet #2, *supra* note 9, at 1.

[16]  Walsh, *supra* note 3.

medicine. The collapse of the oil industry, along with the looting of public resources by the Maduro regime, has left Venezuela without any means to pay for these essential, life-preserving imports. Total imports have collapsed by almost 70 percent amidst hyperinflation.

## B.  The Current Lawsuits

The Republic and its state-owned enterprises currently face approximately $140 billion in claims arising from outstanding debt instruments and claims of expropriation of foreign investment in Venezuela. The National Assembly and the Guaidó administration denounce the kleptocracy, misconduct, and mismanagement that led to many of these cases, and intend to restore democracy, economic security, and prosperity to the nation of Venezuela. To that end, the National Assembly and the Guaidó administration plan to respond to all claims and come to terms with all the Republic's creditors. The Guaidó administration is therefore formulating a sustainable economic recovery plan that will be supported by the international community and has published guidelines setting forth principles that will govern the formulation of a restructuring plan.[17] This economic recovery plan will involve the orderly, consensual debt restructuring of all legitimate claims against the Republic and its state-owned enterprises. Once adopted, the Republic's restructuring plan will be fully consistent with the law and foreign policy of the United States.

Given this forthcoming plan, the vast majority of holders of Venezuelan debt instruments have determined that it is in their interest not to commence litigation. However, a few plaintiffs have commenced actions, spurred on by fear of being left behind as other cases proceed—threatening a "run on the bank" effect. As one plaintiff in a recently-filed case explained,

> Plaintiffs are aware of the ongoing economic and political instability
> in Venezuela. This instability, however, has not prevented other

---

[17]  *See* Office of the Special Attorney General of the Bolivarian Republic of Venezuela, *Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt* (July 1, 2019) ("*Guidelines*") (attached as Exhibit 1).

> creditors from pursuing remedies. Notably, the Third Circuit recently confirmed Crystallex International Corporation's right to collect on an arbitral award against Venezuela by seizing shares of Citgo's parent company. These regrettable circumstances, combined with Venezuela's continued refusal to pay, constrain Plaintiffs to bring the present action to preserve their rights as beneficial owners of Securities. As investors in Venezuela, Plaintiffs are vitally interested in the nation's future and desire to work with its many stakeholders.

Complaint ¶ 31, *ACL 1 Invs. Ltd. v. Bolivarian Republic of Venezuela*, No. 19 Civ. 9014 (LLS) (S.D.N.Y. Sept. 27, 2019), ECF No. 1.

In the short term, these piecemeal lawsuits will consume scarce governmental resources that should be allocated to addressing the unprecedented economic, political, and humanitarian crisis in Venezuela. In the longer term, the sort of fractured adjudication of claims envisioned by these cases has a high likelihood of obstructing the Republic's debt-restructuring plan—a plan that goes hand-in-hand with the Republic's recovery strategy.

## ALLEGATIONS AND PROCEDURAL BACKGROUND

Plaintiffs assert that they are the beneficial owners of securities issued by the Republic, that the Republic waived sovereign immunity from adjudication of their claims, and that they have not been paid. Plaintiffs seek judgment in the total amount of approximately $390 million, plus interest and attorneys' fees.

The Court ordered discovery to go forward. The Republic conducted discovery with three objectives:

1. confirm that plaintiffs actually own the bonds or notes, have not transferred them, and have received the legal title holder's proxy to assert claims;

2. confirm that plaintiffs acquired the right to sue on the bonds or notes in due course and without fraud; and

3. confirm the identity of the plaintiffs and their beneficial owners, to ensure that these are not subject to sanctions or counterclaims by the Republic.

Counsel for plaintiffs in these two cases cooperated in discovery and provided documents and verified representations in response to the Republic's document requests and interrogatories. The responses demonstrated that cases like the ones now before the Court must be evaluated individually to confirm that the plaintiff has standing, that there is no indication of fraud or corruption, and that the Republic is not aware of any claims it has against the plaintiffs.

## ARGUMENT

### I.   The Court Should Stay These Cases.

A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). A district court may also stay a case in the interest of international comity. *See, e.g.*, *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002). A stay of these proceedings is warranted under both doctrines.

### A.   This Court Should Exercise Its Inherent Power to Stay These Cases.

A district court's inherent authority "to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). In deciding whether to stay a case pursuant to its inherent authority, this Court usually considers:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil ligation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Jiminez v. Credit One Bank, N.A.*, 377 F. Supp. 3d 324, 336 (S.D.N.Y. 2019) (citation omitted). This test, "however, no matter how carefully refined, can do no more than act as a rough guide for the district court as it exercises its discretion." *Louis Vuitton*, 676 F.3d at 99. Ultimately, "[t]he

decision whether to stay an action calls on a district court's studied judgment, requiring the court to examine the particular facts before it and determine the extent to which . . . a stay"—or lack thereof—"would work a hardship, inequity, or injustice to a party, the public or the court." *Range v. 480-486 Broadway, LLC*, 810 F.3d 108, 113 (2d Cir. 2015) (internal quotation marks and citation omitted). In this case, these factors counsel in favor of a stay at this time.

**1. Plaintiffs' Private Interests.** Plaintiffs assert that they have an interest in proceeding expeditiously. But Plaintiffs' interests must be viewed in light of the risks they assumed upon buying the securities at issue and their realistic expectations of the timing of any repayment, especially given that the current U.S. sanctions regime concerning Venezuela prevents any collection on debts of the Republic absent specific permission from the Executive Branch. Plaintiffs in these cases purchased the securities at a material discount, because investors understood at that time— in the midst of the present economic crisis—that the prospects for timely repayment were remote. Indeed, Pharo Macro increased its position in the 7.75% 2019 Bonds *after* filing its complaint. MSJ 3 n.2.

In addition, Plaintiffs' concern that they will be "left behind" while other creditors—most prominently Crystallex—move ahead toward collection has been mooted by the stay entered by Chief Judge Stark of the District of Delaware. Moreover, current U.S. economic sanctions concerning Venezuela affirmatively forbid *any* enforcement of *any* judgment without permission from the Treasury Department's Office of Foreign Assets Control. *See* Exec. Order No. 13,884, 84 Fed. Reg. 38,843 (Aug. 5, 2019) (forbidding any transfer of property of Venezuela without a specific license). Applicable regulations, some of which have been promulgated in the past few weeks, expressly forbid any unlicensed "enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or

otherwise alter or affect [blocked] property or interests in [blocked] property." 31 C.F.R. § 591.506(c); *see id.* § 591.407 (providing that only a "specific license" authorizes judgment enforcement purporting to alter or affect interests in Venezuela's property). The President is authorized to impose such sanctions. *See* 50 U.S.C. § 1701(a)(1)(B) (authorizing President to "prohibit, any acquisition . . . use, transfer . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest.").

**2. Defendant's Interests.** Against Plaintiffs' reasonable expectations, the Court must weigh the tremendous harm to the Republic—and its citizens—that would be triggered by further proceedings. Plaintiffs' attempts to collect on their claims, if allowed to proceed to judgment, will contribute to a mad scramble for assets among the Republic's many creditors. Allowing this case to proceed would thus undermine the Republic's sovereign efforts to address the unprecedented humanitarian crisis within Venezuela and, consistent with U.S. policy, to preserve the Republic's assets for the benefit of the Venezuelan people. In the corporate bankruptcy context, the Second Circuit has observed that a stay contributes to the restructuring process and can "prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *See In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992) (citations and quotation marks omitted)).

The prospects for a "chaotic and uncontrolled scramble" for Venezuelan assets in the United States are particularly acute in this case, because Venezuela and its state-owned enterprises (SOEs) have significant assets in the United States as a result of their extensive commercial contacts with the United States. These contacts are far more extensive than any emerging-market country that has restructured its external debt in the last 25 years. Further, the claims against

Venezuela and its SOEs are also highly diverse because—unlike the majority of the sovereign debt restructurings in the previous decades—a significant portion of these claims did not arise from financial debt instruments. They include, for example, claims of unpaid suppliers and damages resulting from expropriations and nationalizations by the Chávez and Maduro regimes. The claims' diversity increases the risk that, absent a temporary stay, creditors will resort to legal action in the United States that threaten to disrupt, rather than facilitate, the voluntary, orderly restructuring that ultimately best serves all stakeholders.

Recognizing these risks, Chief Judge Stark in the District of Delaware has stayed multiple cases pending against the Republic and its SOEs. Chief Judge Stark's stay decision was motivated in substantial part by the court's "concern not to create a 'run on the bank,' that is, an influx of creditors to the Court, with negative consequences for the Republic, for U.S. policy (which favors an orderly transition of power in the Republic and a coordinated restructuring of its debts), and, potentially, th[e] Court." *Crystallex*, 2019 WL 6785504, at *3.[18]

Other courts have also entered stays of litigation against the Republic and its SOEs of various duration and for various reasons. *See, e.g.*, Memorandum and Order at 3, *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, No. 19-cv-2689 (S.D.N.Y. July 3, 2019), ECF No. 32 (granting stay because "the Guaidó government does not have full access to the Republic's operations, facilities, or personnel"); Order at 1 *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, No. 19-cv-2519 (S.D.N.Y. May 6, 2019), ECF No. 33 (granting stay "[g]iven the current political

---

[18]     *See also Crystallex*, 2019 WL 6785504, at *3 n.11 ("So what is happening right now is on the one side, you have got a terrible crisis and a struggling government trying desperately to dislodge a despot and on the other side, you have a group of people, many of whom support the goals of the Guaidó government, support the intention to restore the economy, restore democracy, engage in a consensual restructuring, but they see what is happening in this courtroom and they feel that they cannot stand on the side-lines." (quoting counsel for the Republic)).

environment in Venezuela"); Paperless Order Granting Motion to Stay, *Comparelli v. Republica Bolivariana de Venezuela*, No. 14-cv-24414 (S.D. Fla. May 9, 2019), ECF No. 168 (granting stay); Order, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, S.A.*, No. 11-CV-01735 (D.D.C. Feb. 15, 2019), ECF No. 133 (same); Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044 (D.C. Cir. Feb. 14, 2019), Doc. No. 1773506 (granting stay pending completion of appellate proceedings in France).

The interest of the Republic in a stay of its sovereign debt cases is particularly strong: with billions of dollars at issue, a denial of the motion for a stay would be an unmistakable signal to the debt markets encouraging a chaotic scramble for assets.

**3. Judicial Resources.** Continuing the litigation at this stage would be wasteful of judicial resources. The more quickly this Court moves forward, the more cases it will attract. Each case requires devotion of resources to discovery and evaluation. And yet at this point entry of judgment is an empty, ministerial act, because applicable sanctions absolutely forbid any person subject to U.S. law to enforce any such judgment absent a specific license to do so. 31 C.F.R. §§ 591.407, 591.506(c). It would be far more efficient for the Court to stay litigation until such time as the Republic is in a position to propose an orderly, consensual debt resolution plan supported by the international community, in accordance with U.S. sanctions. At that future stage, any plaintiffs who are unwilling to participate in the restructuring may resort to judicial proceedings to press their contract rights.

**4. Non-Parties' Interests.** Humanitarian interests and human-rights protections weigh heavily in the balance on this motion. Indeed, the vast majority of the Republic's creditors have determined not to proceed with litigation, recognizing the desperate humanitarian crisis in Venezuela, and the harm that would befall the Republic's numerous stakeholders from a chaotic

scramble for assets that could be put to more effective use by alleviating the humanitarian crisis and reviving the Venezuelan economy. Those few creditors who are proceeding should not be rewarded with an advantage over a much larger number of similarly situated creditors and at the expense of millions of people in desperate economic conditions.

**5. The Public Interest.** Finally, it is in the public interest to stay this case. U.S. policy "favors an orderly transition of power in the Republic and a coordinated restructuring of its debts." *Crystallex*, 2019 WL 6785504, at *3. As Treasury Secretary Mnuchin has explained, Executive Branch sanctions concerning the crisis in Venezuela serve a dual purpose: (1) "to support Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy," and (2) to "prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela."[19]

In Delaware, Chief Judge Stark agreed to continue a stay after concluding that doing otherwise "would undermine a foreign ally, worsen a grave humanitarian crisis, and tread on diplomatic sensitivities." *Crystallex*, 2019 WL 6785504, at *3 n.10. This is not to say that the Republic wishes to avoid its debts. To the contrary, as Chief Judge Stark explained, the Republic "recognizes that it must pay what it owes," and merely asks this Court to follow those other judges who have attempted "to carefully balance the many competing interests in a dynamic and internationally sensitive set of circumstances." *Id.* at *4. Staying this litigation would further U.S. policy by discouraging efforts by aggressive claimants to disturb the equal ranking of similarly situated creditors through litigation, collection actions, attachments, or other means. The Guaidó administration has consistently stated that all the legacy claims from the Chávez and Maduro regimes will be

---

[19]   Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594 ("*Treasury Sanctions Venezuela's State-Owned Oil Company*").

reconciled in an orderly and consensual process, in accordance with Venezuelan law, while prioritizing the unprecedented crisis in Venezuela.[20] The unique circumstances of this case accordingly satisfy all five factors supporting issuance of a litigation stay. This Court should exercise its authority to stay further proceedings.

### B.    The Court Should Stay These Cases in the Interest of International Comity.

International comity is "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522, 543 n.27 (1987). It concerns "maintaining amicable working relationships between nations, a shorthand for good neighbourliness, common courtesy and mutual respect." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 189–90 (2d Cir. 2018) (quotation marks and citation omitted). "[U]nder the federal common law principles governing comity-based abstention," a court should stay litigation proceedings when justified by considerations of international comity. *United Feature Syndicate*, 216 F. Supp. 2d at 211–12. Indeed, judicious employment of the Court's inherent powers to stay litigation is especially important in such cases, where "judicial scrutiny of sovereign decisions" could "embarrass the political branches of our government in the conduct of foreign policy." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165–66 (D.C. Cir. 2002).

A stay based on international comity is warranted in this case in light of: (1) the abstention doctrine first outlined by the Supreme Court in *Canada Southern Railway Co. v. Gebhard*, 109 U.S. 527 (1883), which applies to the foreign debt-restructuring; (2) the customary international law doctrine of necessity; and (3) the Republic's currently inability to access the resources necessary to make good on its financial obligations at this time.

---

[20]    *See Guidelines*, *supra* note 17 (attached as Exhibit 1).

1.    *Canada Southern Railway* Comity-Based Abstention is Appropriate.

In *Canada Southern Railway*, the Supreme Court applied principles of international comity in the context of litigation involving Canada's plan for restructuring certain debts of its national railroad in bankruptcy. *See* 109 U.S. at 539. Railroad bondholders sued in federal court to recover the value of their bonds, but the Court determined that their claims would have to give way to Canada's restructuring plan. The Court explained that deferring to a foreign nation's reorganization was not only a permissible exercise of judicial authority, but indeed "in entire harmony with the spirit of bankruptcy laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations." *Id.* at 539. As the Court explained:

> Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances *the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries*.

*Id.* (emphasis added). The Court thus explained that "home creditors," who are necessarily bound to the sovereign's coordinated resolution of bondholder claims in bankruptcy, should not be placed at a disadvantage as compared to those bondholders located "abroad." *Id.*

To be sure, there is no bankruptcy statute available for foreign sovereigns. But courts in this Circuit facing sovereign debt restructurings have stayed proceedings to permit time for a negotiated outcome between a sovereign and its creditors. *See, e.g.*, *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 585–56 (2d Cir. 1997) (noting that the circumstances of sovereign restructurings may justify "a stay of the proceedings or, in the alternative, a stay of the execution of . . . judgment[s] because either stay might allow the completion of . . . negotiations with its creditors without unduly threatening the ultimate enforceability of the debt"); *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 165 B.R. 379, 387 (S.D.N.Y. 1994) (staying

litigation against Banco Popular, a state-owned Peruvian bank, and noting that "Congress has determined that it is in the United States policy interest to require a debtor country to engage in the IMF's debt resolution procedure and to negotiate debt terms with creditors in accordance with a country's ability to pay") (internal quotation marks omitted); *see also Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d 516, 519 (2d Cir. 1985) (U.S. policy supports "debt resolution procedure that operates through the auspices of the International Monetary Fund (IMF)," which "encourages cooperative adjustment of international debt problems" in a "system of international cooperation and negotiation" under which "the underlying obligations to pay nevertheless remain valid and enforceable").

The Second Circuit's application in *Allied Bank* of comity principles under *Canada Southern Railway* is particularly instructive. In that case, after "a severe economic crisis" caused Costa Rica to default on its debt, a number of debtholders filed suit while "negotiations . . . for the rescheduling of payments of [Costa Rica's] obligations" were ongoing, and the district court dismissed the claims under the act of state doctrine. *Allied Bank Int'l v. Banco Credito Agricola*, 733 F.3d 23, 1984 U.S. App. LEXIS 23237, at *3–*4 (2d Cir. 1984) (per curiam). The Second Circuit affirmed the dismissal, but under comity principles instead. Relying on *Canada Southern Railway*, the Second Circuit explained that American courts are obliged to respect a foreign sovereign's attempts to resolve debt claims so long as they are "consistent with the law and policy of the United States." *Id.* at *9. In light of "support voiced for the [debt] renegotiation by both the legislative and executive branches of our government," therefore, the Second Circuit concluded that the "validity" of Costa Rica's efforts "should be recognized in United States courts." *Id.* at *11 (citing *Canada Southern Railway*, 109 U.S. at 539). Following that ruling, the United States submitted a brief expressing the view that Costa Rica had "attempted [a] *unilateral* restricting of private

16

obligations," which the United States considered to be "inconsistent with th[e] system of international cooperation and negotiation and thus inconsistent with United States policy." 757 F.2d at 519 (emphasis added). "In light of the government's elucidation of its position," the Second Circuit withdrew its previous ruling that comity principles required dismissal of the debtholders' claims. *Id.* at 520. Crucially, however, the court reaffirmed its view that federal courts are obligated to defer to the debt-resolution efforts of foreign sovereigns where doing so is "consistent with United States policy." *Id.*

The same comity principles applied in *Canada Southern Railway* and *Allied Bank* support a temporary stay of bondholder litigation against the Republic. The Republic has begun the process of formulating both (1) a comprehensive economic recovery plan, to be implemented once the political and humanitarian crisis can be abated; and (2) a comprehensive, orderly, and consensual restructuring of its outstanding financial obligations, supported by the international financial community.[21] Thus, unlike Costa Rica's "unilateral" attempt in *Allied Bank* to repudiate its debt, 757 F.2d at 519, the Republic has already committed itself to pursuing a consensual resolution with all of its creditors once the political environment makes this feasible. The Republic requires time to develop and to implement these plans, however, especially considering the grave humanitarian crisis and the many creditors and claimants who will need to participate in restructuring negotiations and ultimately agree to any debt restructuring:

> The [Guaidó administration] recognize[s] that designing an economic recovery program for a country in the condition of Venezuela will be a challenging and time-consuming task. That program is expected to include a projection about the level of debt and associated debt service requirements that the country will be able to carry in future years. As a practical matter, a detailed discussion about the financial terms of the foreign currency-denominated claims renegotiation must await the conclusion of the IMF's assessment of

---

[21]    *See Guidelines*, supra note 17 (attached as Exhibit 1).

> Venezuela's condition and economic prospects. With that assessment in hand, however, and consistent with IMF policies, the [Guaidó administration] will enter into discussions with representatives of the various claimant groups regarding both the proposed financial terms for the renegotiation of their claims and the nature of the new debt instruments that will be issued.

*Id.* at 3. A stay will thus provide the Republic with necessary breathing room for a negotiated settlement, without prejudicing a creditor's eventual right to enforce its contract rights following the settlement.

The spirit of comity is especially strong here in light of the Executive Branch's commitment to "rebuilding Venezuela's infrastructure and economy," and "supporting the effort to restore democracy and stability in Venezuela."[22] Treasury Secretary Mnuchin has explained that the United States intends to "continue to use the full suite of its diplomatic and economic tools to support Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy."[23] Vice President Pence has likewise declared that it is "in [America's] interests . . . to come together around a restoration of liberty, the rule of the law, and democracy in Venezuela."[24] And, as recently as last week, Secretary of State Pompeo reaffirmed that "[t]he United States and democratic allies throughout the world remain committed to the Venezuelan people and their effort to end the brutal and inept dictatorship under which they live."[25]

In these exceptional circumstances, the same "spirit of international comity" that applied

---

[22]   *President Donald J. Trump Stands for Democracy in Venezuela* (May 1, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-stands-democracy-venezuela/.

[23]   *Treasury Sanctions Venezuela's State-Owned Oil Company*, *supra* note 19.

[24]   *Remarks by Vice President Pence in Press Gaggle, Jacksonville, Florida* (May 20, 2019), https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-press-gaggle-jacksonville-florida/.

[25]   *See United States Congratulates Guaidó*, *supra* note 2.

18

in *Canada Southern Railway* and *Pravin Banker* supports a temporary stay of litigation to ensure that the Republic can address its humanitarian crisis and implement strong macroeconomic policies in connection with an orderly debt restructuring plan that is comprehensive, voluntary, and supported by the relevant international financial institutions and actors. Allowing this litigation to proceed now, in contrast, could adversely affect the ability of the National Assembly and Interim President Guaidó to complete the Republic's transition to democracy and thus undermine the interests of the United States. This Court should therefore stay this litigation for the purpose of "maintaining amicable working relationships" and "mutual respect" between the United States and the Republic. *See Leopard Marine*, 896 F.3d at 189–90.

### 2. A Stay Is Justified Under the Customary International Law Doctrine of Necessity.

It is well-settled that "[i]nternational law is part of our law." *The Paquete Habana*, 175 U.S. 677, 700 (1900); *see United States v. Trinidad*, 839 F.3d 112, 122 n.16 (1st Cir. 2016) ("Customary international law is part of the federal common law."); *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (accepting "the settled proposition that federal common law incorporates international law"); U.S. Br. at 1, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) (No. 79-6090), *reprinted in* 19 I.L.M. 585, 606 n.49 (1980) ("Customary international law is federal law, to be enunciated authoritatively by the federal courts."); *Restatement (Third) of Foreign Relations Law* § 111(1) (1987) ("International law . . . [is] law of the United States and supreme over the law of the several States . . . .").

Thus, U.S. courts "are bound to give effect to international law." *Restatement (Third) of Foreign Relations Law* § 111(3). Of relevance here is the doctrine of necessity (*état de nécessité*), a defense derived from customary international law. *See* Responsibility of States for Internationally Wrongful Acts, art. 25, U.N. G.A. Res. 56/83 (Dec. 12, 2001), U.N. Doc.

A/56/49(Vol.I)/Corr.4. That doctrine applies where an essential state interest has been put in "extreme peril" that "represents a grave danger to the existence of the State itself, its political or economic survival, the continued functioning of its essential services, the maintenance of internal peace, [or] the survival of a sector of its population." *See State Responsibility*, Y.B. Int'l L. Comm'n (1980) 14, U.N. Doc. A/CN.4/Ser.A/1980/Add.1 (Part 1); *State Responsibility*, Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4.Ser.A/2001/Add.1 (Part 2) ("The term 'necessity' (*état de nécessité*) is used to denote those exceptional cases where the only way a State can safeguard an essential interest threatened by a grave and imminent peril is, for the time being, not to perform some other international obligation of lesser weight or urgency."); *id.* at 80–81 ("There is substantial authority in support of the existence of necessity as a circumstance precluding wrongfulness."); *see also* James Crawford, *State Responsibility: The General Part* 305–15 (2013) (outlining the necessity doctrine).

Under those circumstances, the state's financial obligations may temporarily be deferred, until the circumstances giving rise to the "extreme peril" have passed. This doctrine has been well-documented by the U.N. International Law Commission (a body of experts established by the United Nations to assist in the development and codification of customary international law). *See State Responsibility*, Y.B. Int'l L. Comm'n (1980) 34 (Art. 33), U.N. Doc. A/CN.4/Ser.A/1980/Add.1 (Part 2); U.N. G.A. Res. 56/83, *supra*, (Art. 25). It has been recognized by tribunals applying international law as allowing a state to protect an "essential interest" threatened by a "grave and imminent peril." *Gabcikovo-Nagymaros Project (Hung. v. Slovk.)*, Judgment, 1997 I.C.J. 7, 39–40 (Sept. 25); *see also Cont. Cas. Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168 (Sept. 5, 2008) (the doctrine of necessity is "intend[ed] to provide flexibility in the application of international obligations, recognizing that necessity to protect national

interests of a paramount importance may justify setting aside or suspending an obligation, or preventing liability from its breach"); *LG&E Energy Corp. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, ¶ 246 (Oct. 3, 2006) ("[A] state of necessity is identified by those conditions in which a State is threatened by a serious danger to its existence, to its political or economic survival, to the possibility of maintaining its essential services in operation, to the preservation of its internal peace, or to the survival of part of its territory.").

The doctrine of necessity may apply only in rare and exceptional economic collapses that pose a threat to the existence of the State as a polity created to satisfy collective necessities. This is the case of Venezuela, a fragile state that is facing an unprecedented economic collapse, a massive migrant and refugee crisis, and a complex humanitarian emergency. In this regard, Venezuela's crisis is not merely a debt crisis, like the Argentina sovereign debt crisis; rather, Venezuela is facing an unparalleled social collapse. As detailed above, present circumstances in Venezuela threaten imminent peril to the country, millions of its citizens, and also the region. As stated by the Permanent Council of the Organization of the American States, "the Venezuelan crisis has a destabilizing impact and represents a clear threat to peace and security in the Hemisphere."[26] This threat to the existence of the state itself constitutes a state of necessity under international law. The current complex humanitarian emergency represents one of those rare circumstances where the doctrine of necessity applies, taking into consideration the economic, political, and social collapse in Venezuela—a crisis so grave that it has never been seen outside of war or state collapse.

This crisis is being aggravated by the refusal of former president Nicolás Maduro to relinquish his position or permit aid to enter the country. The Republic cannot, consistent with its

---

[26]     Resolution No. 1137 (2245/19) (September 12, 2019), *available at* https://www.oas.org/es/centro_noticias/comunicado_prensa.asp?sCodigo=C-065/19.

obligations to its citizens under international law, allocate extremely limited financial resources to pay or settle financial debts while its citizens are starving and lack access to the most basic of necessities. Deferring the Republic's financial obligations is therefore "the only way for the State to safeguard an essential interest against a grave and imminent peril." *State Responsibility,* Y.B. Int'l L. Comm'n (1980), *supra*, 80. A stay or dismissal without prejudice of collection and enforcement proceedings in the United States would comport with public international law and would ensure that the Republic's extremely limited resources can be fully allocated to solving the present humanitarian crisis and restoring Venezuela's economy.

> **3.     A Stay Is Justified Because the Republic Is Unable to Access Resources Necessary to Perform or Settle Its Financial Obligations at this time.**

Under present circumstances, it is impossible for the Republic to perform or settle its debts and obligations at this time and in the absence of an economic turnaround. Indeed, the Guaidó administration—the sole recognized representative of the Republic in the United States—cannot itself access the limited financial resources located in Venezuela because of the continued domination of the Republic's key industries by the Maduro regime, which continues to block access by the Guaidó administration and the National Assembly to key Venezuelan governmental and financial institutions which will be required to rebuild the Venezuelan economy and to address the hundreds of billions of dollars in claims against the Republic.

The unique combination of humanitarian, political and economic forces makes it impossible, at this time, to implement the economic reforms that will be required to reverse the complex humanitarian emergency and promote the economic recovery of Venezuela. Once the current humanitarian and political crises are abated, the Republic anticipates that it will be able to use Venezuela's vast natural resources to begin to recover the country's productive capacity and to develop an orderly, consensual restructuring of its debt obligations to creditors. Such a program will take

time. In the interim, it is impossible for the Republic to access adequate financial resources to perform or to settle its obligations. A stay is therefore reasonable until the Republic may tap the resources it needs to resolve these cases and satisfy its obligations.

II.   **Alternatively, if the Court Moves Forward, It Should Deny Plaintiffs' Request for Prejudgment "Interest on Interest" and Establish Fraud-Prevention and Error-Prevention Mechanisms Concerning the Securities Underlying the Claims.**

A.   **The Court should Deny Plaintiffs' Request for Pre-Judgment "Interest on Interest."**

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995) (quotation marks and citation omitted). Such interest is not awarded as a matter of course. Rather, "[i]n deciding whether an award of prejudgment interest is warranted, it must be remembered that this is an equitable remedy and courts must be careful that an award does not overcompensate a plaintiff." *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 614 (2d Cir. 1994). Under the circumstances of this case, an award of prejudgment interest would not be appropriate.

1.   **The Federal Standard for Determining Prejudgment Interest Applies.**

Because this Court's jurisdiction over plaintiffs' claims arises under federal law, the federal standard for prejudgment interest applies. Plaintiffs seek relief pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–1611, which provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 200 (2d Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). "Under the FSIA, a foreign sovereign and its instrumentalities are immune from suit in the United States courts unless a specific statutorily defined exception applies. Absent such an exception, the immunity conferred by the FSIA strips

courts of both subject matter and personal jurisdiction over the foreign state." *Id.* (citation and quotation marks omitted). Casa Express brought its lawsuit in federal court, invoking the Court's jurisdiction under the FSIA, 28 U.S.C. § 1330(a). Complaint ¶ 11, No. 18 Civ. 11940 (filed Dec. 18, 2018), ECF No. 1. Pharo initially brought suit against the Republic in state court, and the Republic removed the suit to federal court under the FSIA, 28 U.S.C. § 1441(d). Notice of Removal ¶ 7, No. 19 Civ. 3123 (filed April 8, 2019), ECF No. 1. This court's subject-matter jurisdiction over both lawsuits is accordingly based on the Republic's waiver of foreign sovereign immunity under the FSIA, 28 U.S.C. § 1605(a)(1), absent which the suit could not proceed. Given the federal basis for this Court's jurisdiction, the decision whether to award prejudgment interest rests in the Court's discretion, as per the normal federal standard. *See Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1077 (10th Cir. 2002) ("[A] federal rate of interest rather than the state rate applies where jurisdiction is based on a federal question.").

Despite the federal character of their suit, plaintiffs nevertheless seek interest on unpaid interest at the statutory rate applicable in New York state courts. The court should deny that request. Federal courts apply state-law interest in "diversity case[s]," where the federal court sits *in place of* a state court. *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). That principle has no application where, as here, the basis for the court's jurisdiction over the suit is distinctly federal.

In seeking to apply New York's statutory rate, plaintiffs rely on contractual choice-of-law clauses (MSJ 16), which provides that the securities are governed by, and shall be construed in accordance with, New York law. But the Second Circuit has expressly held that "the existence of a choice-of-law provision, standing alone," does not "demonstrate[] a 'clear, unambiguous and unequivocal' intent to deviate from the federal rate." *FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 148 (2d Cir. 2010) (quoting *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir.

24

2004)). *FCS Advisors* concerned post-judgment interest, but the principle stands. Where the federal standard for determining interest applies, a choice-of-law provision does not displace it.

Plaintiffs also cite *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250 (2011); *Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289 (2d Cir. 2009); and *NML Capital v. Republic of Argentina*, 435 F. App'x 41 (2d Cir. 2011), as examples of courts imposing New York's statutory prejudgment interest rate. But in each of those cases, the parties did not dispute—and the courts did not decide—whether New York law applied.

It is no answer that plaintiffs have asserted state contract claims against the Republic. The Republic is a sovereign entity, and cannot be haled into court on state-law claims as if it were a regular litigant. The FSIA is the sole basis on which this Court or any other court is authorized to hear claims against the Republic. *See Arch Trading Corp.*, 839 F.3d at 200; 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."). Under those circumstances—where neither plaintiffs nor the Republic have invoked or could have invoked this Court's diversity jurisdiction—the federal standard applies. *See McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 586 (9th Cir. 1983) ("Congress, as part of the FSIA, removed this jurisdiction [over foreign sovereigns] from section 1332," the diversity-jurisdiction provision).

The Second Circuit's decision in *Endico Potatoes* is instructive. In that case, the court rejected the plaintiffs' argument "that their claim is essentially a state law claim" and thus entitled to prejudgment interest under state law, explaining that federal question jurisdiction—not diversity—provided the basis for the court's subject-matter jurisdiction: "Significantly, had [plaintiffs'] claims been based on state law, each of their claims would have been dismissed for lack of subject

matter jurisdiction—the [plaintiffs'] claims . . . were for less than $50,000 and there is no diversity of citizenship . . . ." 67 F.3d at 1071–72.

So too here. But for the FSIA—which is a federal grant of subject-matter jurisdiction, *see* 28 U.S.C. § 1330(a), and a substantive limitation on foreign sovereign immunity, *see id.* § 1605(a)—this lawsuit could not be brought in *any* court in the United States. *See Arch Trading Corp.*, 839 F.3d at 200. Plaintiffs' lawsuits therefore arise under federal law, and the federal standard for determining prejudgment interest applies. *See Endico Potatoes*, 67 F.3d at 1071–72; *Schipani*, 541 F.3d at 164.

### 2.    The Court Should Not Award Prejudgment Interest on Interest Payments.

In exercising its discretion whether to award prejudgment interest, the decision "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992). Moreover, "[a]wards of prejudgment interest must not result in over-compensation of the plaintiff," *id.* at 834, and courts should deny requests for prejudgment interest where the plaintiff has been fully compensated by the judgment.

The Court should exercise its discretion to deny plaintiffs' request for prejudgment interest on the unpaid interest payments. The bonds and notes at issue in this litigation accrue interest at premium rates, which compensate investors for the relatively higher chance of nonpayment or delayed payment compared to other sovereign debt (such as U.S. Treasury bonds). As the Second Circuit has recognized, prejudgment interest is especially inappropriate where plaintiffs seek compensation for "extremely risky" investments, where the plaintiffs "were fully aware of the risk and

chose to invest in spite of it." *Commercial Union Assurance*, 17 F.3d at 614. Plaintiffs here purchased the securities at a substantial discount—in the midst of the current economic crisis—and were fully aware of the risk of nonpayment. Indeed, Pharo Marco *increased* its position *after* initiating this lawsuit. MSJ 3 n.2.

In addition, the bonds and notes *themselves* provide for continuing accrual of interest at those premium rates in the event of default until they are repaid. *See Deutsche Bank Tr. Co. Americas v. Am. Gen. Life Ins. Co.*, No. 1:15-CV-3869-GHW, 2015 WL 5178408, at *3 (S.D.N.Y. Sept. 4, 2015) (granting reconsideration of discretionary grant of prejudgment interest because the plaintiff "already receives interest payments on the outstanding principal under the terms of the Class I–A Notes"). Granting plaintiffs' an additional interest rate on top of the high interest rates they already enjoy would result in over-compensation, and would be fundamentally unfair in light of the parties' reasonable, bargained-for expectations at the time they made their investments. *See Commercial Union Assurance*, 17 F.3d at 614 (affirming denial of prejudgment interest, where "[w]hat has been repaid to the [plaintiffs] more than adequately satisfies any equitable demand for interest on the capital recovery."); *see also Wickham Contracting Co.*, 955 F.2d at 833–34.

Finally, and in any event, if the Court does exercise its discretion to award prejudgment interest, it should do so at the federal post-judgment interest rate, 28 U.S.C. § 1961(a), which—in addition to the substantial premiums they are already receiving—would more than adequately compensate plaintiffs for the risks they knowingly assumed.

## B.   The Court Should Establish Fraud-Prevention and Error-Prevention Mechanisms Concerning the Securities Underlying the Claims Before Awarding Judgment

In the event the Court decides to move forward at this time, it should also consider mechanism to prevent error or fraud that could otherwise arise as a result of the fact that the securities at issue are "global" bonds and notes, reflected in a single "immobilized" certificate held by a

securities depository. *See Delaware v. New York*, 507 U.S. 490, 495 (1993) ("The economies of scale attained in the modern financial services industry are epitomized by the securities depository, a large institution that holds only the accounts of 'participant' brokers and banks and serves as a clearinghouse for its participants' securities transactions. Because a depository retains record ownership of securities, it effectively 'immobilizes' the certificates in its possession by allowing its participants to trade securities without the physical transfer of certificates.").[27]

Plaintiffs do not hold physical certificates; rather they hold their beneficial ownership in "street name" by maintaining accounts at financial institutions or brokerage houses. "Street name accounts . . . permit changes in beneficial ownership to be effected through book entries rather than the unwieldy physical transfer of securities certificates." *Id.* (citing J. Robert Brown, *The Shareholder Communication Rules and the Securities and Exchange Commission: An Exercise in Regulatory Utility or Futility?*, 13 J. Corp. L. 683, 688–91 (1988)).

This ease of transfer, however, gives rise to a potential concern. An unscrupulous plaintiff with a judgment could attempt to "double dip" by obtaining a judgment and then selling securities to an unsuspecting third party without disclosing the judgment to the buyer or the sale to the Defendant. Or, honest error could result in a double payment following a transfer of the securities out of plaintiffs' accounts. The Republic therefore requests this Court to establish a process to protect the Republic from the potential for fraudulent or erroneous claims in the future, once the Republic undertakes a comprehensive restructuring of its financial obligations.

The Court has options as to the appropriate mechanism. In limited circumstances, beneficial owners of securities issued in registered global form may be permitted to exchange their street-

---

[27]   The global certificates at issue in this case are registered in the name of Cede & Co., as nominee for the Depository Trust Company (DTC) and physically held by the Republic's Fiscal Agents as custodians for DTC.

name beneficial interests for physical certificates.[28] The Court may require, as a condition of the judgment, that the plaintiffs, the DTC, the Fiscal Agents and the Republic all take such actions as may be necessary or advisable to cause definitive registered note certificates to be issued to plaintiffs to evidence the bonds or notes that have become the subject of a final judgment. Any transfer of such certificates would require notice to the Fiscal Agents.

If plaintiffs' beneficial interests in the securities are to remain in registered global form, as is currently the case, the Court could order plaintiffs to transfer their beneficial interests, through the book-entry system, to a securities account maintained by the Clerk of the Court. Securities transferred to such an account would be held for the benefit of plaintiffs or their assignees or designees. Alternatively, the Court could issue an order forbidding plaintiffs and their securities intermediaries to transfer the securities from the accounts in which they are currently held without notice to the Republic's designee and/or a further order of this Court authorizing such transfer, enabling the Republic to track the claims against it and the holders thereof. If plaintiffs wish to transfer any of the securities, they would notify this Court and provide such information as the Court and the Republic reasonably require. Upon receipt of authorization from the Court, plaintiffs would be permitted to transfer the securities in the manner provided for in the applicable FAA.

Should the Court determine that it wishes to proceed to judgment, the Republic requests that the Court schedule briefing on the appropriate mechanism, after hearing from the parties, the Fiscal Agents, and the relevant intermediaries through which plaintiffs hold their securities.

---

[28]    Each of the 1998 Fiscal Agency Agreement (FAA) and the 2001 Fiscal Agency Agreement provides that the definitive registered global notes issued in name of Cede & Co., as nominee for DTC, may be exchanged for definitive registered notes in the name of a beneficial owner if an event of default has occurred and is continuing. *See* Section 5(c) of the 1998 and 2001 FAAs.

## CONCLUSION

For the foregoing reasons, the Court should stay this case.

Dated: January 16, 2020
      New York, New York

Respectfully submitted,

ARNOLD & PORTER
    KAYE SCHOLER LLP

By: _____

Kent A. Yalowitz
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689
Kent.Yalowitz@arnoldporter.com

E. Whitney Debevoise
Stephen K. Wirth
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
Whitney.Debevoise@arnoldporter.com
Stephen.Wirth@arnoldporter.com

*Attorneys for the Bolivarian Republic of Venezuela*